UNITED STATE OF AMERICA
DISTRICT COURT OF THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMETRIUS BUCKLEY,

    Plaintiff

v.

MDOC CORRECTIONS OFFICERS
FINNEY, SPRAGUE, JONES, PROCTOR,
LIEN, FLECK, and DOBIAS, in their
Individual capacities,

    Defendants.

Case No. 1:25-cv-470

Hon.

---

Attorneys for Plaintiffs:
Nicholas Roumel (P 37056)
**ROUMEL LAW**
4101 Thornoaks Dr.
Ann Arbor MI 48104
(734) 645-7507
nick@roumel-law.com

---

# COMPLAINT AND JURY DEMAND

    This is a First and Eighth Amendment action brought by Mr. Demetrius Buckley against Correctional Officers in the Michigan Department of Corrections. After Mr. Buckley published an article critical of MDOC officers, they retaliated against him. First, he was transferred to a cell with a well-known violent inmate. After that inmate predictably assaulted Mr. Buckley, corrections officers denied him medical attention, handcuffed him, placed him in segregation, and pepper sprayed him. The officers kept Mr. Buckley in solitary confinement for ten days, and cited him for misconduct.

1

## PARTIES, JURSIDICTION, AND VENUE

1. At all times relevant, Demetrius Buckley ("Mr. Buckley") was an inmate at MDOC's Handlon Correctional Facility, located at 1728 Bluewater Highway, Ionia, Michigan 48846.

2. Defendants are MDOC Corrections Officers ("COs") whose full identities will be determined through discovery. They are sued in their individual and official capacities.

3. The events giving rise to this lawsuit took place at the Richard A. Handlon Correctional Facility in Ionia, Michigan, in the Western District of Michigan.

4. Jurisdiction is proper in the Western District of Michigan per 28 USC § 1331 and § 1342(a), because this lawsuit arises from Amendments to the United States Constitution.

5. Venue is proper in the Western District of Michigan per 28 USC § 1391, because Defendants work in this District, and the events giving rise to this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

### Mr. Buckley Publishes an Article Critical of the MDOC and COs

6. On August 23, 2023, Mr. Buckley published an article on Prisonreports.org titled "Walking on eggshells: The abuse of power and authority in prisons."[1] The article was critical of MDOC and its correctional officers at Handlon Correctional Facility.

7. In particular, the article is critical of certain COs who are "power-drunk" and falsely write tickets alleging violations of prison rules, or frequently write tickets for low-level, petty violations.

---

[1] *https://prismreports.org/2023/08/23/walking-on-eggshells-power-abuse-prisons/*, accessed 3/12/25.

8. The article identified certain COs with enough specificity that he could be identified. For example, Mr. Buckley wrote about one particular CO, who was Defendant Sprague:

> **Then, out of nowhere, high-level, power-drunk Michigan Reformatory officers arrive at MTU. One of them—CO SP—is removed within days from the Calvin College unit and placed in my unit. His obsessive ticket-writing behavior got him thrown out.**

9. Mr. Buckley went on to describe this officer's proclivity for writing "petty tickets," sometimes in retaliation if prisoners speak with a certain female officer with whom SP was rumored to be in a relationship.

10. The article also identified another officer that SP sent to "shake [] down" the cell of Mr. Buckley and his cellmate.

11. On information and belief, COs who had interactions with Mr. Buckley were aware of the article and discussed the article with each other.

12. At one point, Defendant Jones remarked to Mr. Buckley that he read his article. So did other COs, including at least two who are not defendants.

### COs Retaliate against Mr. Buckley

13. On August 24, 2023, one day after this article was published, COs unexpectedly moved Mr. Buckley to a different cell, B-10, with a new cellmate named Perry.

14. Mr. Buckley did not expect to be transferred because he was in the college unit ("C"), and "B" where he was being transferred was not a college unit and was nicknamed "the hood."

15. When Mr. Buckley asked why he was being transferred, he was not given a reason, but a non-Defendant CO, Wayland mentioned reading an article Mr. Buckley wrote. CO Sprague, smirking, said something to the effect of, "Don't worry about it, I've got a spot for you."

3

16. Inmate Perry had various mental health issues and had a habit of violently assaulting his previous cellmates, of which the COs were well aware. On information and belief, Perry had allegedly murdered a previous cellmate. But at the time Mr. Buckley was moved with Perry, he was not aware of his reputation.

17. Furthermore, on information and belief, the COs at Handlon Correctional Facility frequently moved inmates into cells with violent cellmates as a means of punishing them for various violations or perceived transgressions.

18. After spending a few nights with Perry, and being hit in his sleep, Mr. Buckley, told CO Finney about his safety concerns and asked him to be moved to a different cell. His request was denied. Finney said he "didn't care" that he was being hit in his sleep.

19. Mr. Buckley told CO Handsworth (not a defendant) that he did not feel safe in his cell. He told CO Jones that he feared for his safety.

20. Mr. Buckley also asked CO Sprague to be moved. Sprague replied that he "wasn't going to move him."

21. CO Finney told Mr. Buckley that he didn't care if he died or not.

22. Mr. Buckley was thus forced to stay with Perry, the violent inmate.

**Perry Attacks Mr. Buckley and COs Blame Mr. Buckley**

23. On August 30, one week after Mr. Buckley was moved in Perry's cell, and that his pleas to move were ignored, Perry attacked Mr. Buckley in the middle of the night by striking him repeatedly with a padlock wrapped around a belt.

24. The attacks caused visible physical injuries to Mr. Buckley, including an open wound on his head.

25. Mr. Buckley reported the incident that same night to the COs on the next shift.

26. Despite evidence to the contrary, including a head wound, the COs blamed Mr. Buckley for the altercation. CO Jones told Mr. Buckley "you were the aggressor" and that Perry had allegedly told him that Buckley had hit him first.

27. Jones did not take pictures of his injuries as required by MDOC's policy, telling Mr. Buckley that he had a "broken camera." Nor did they take him to health care as required by MDOC's policy for the injury; a health care person didn't examine the injury and simply asked Mr. Buckley for his name and MDOC inmate number.

28. Two other officers arrived. While Mr. Buckley was trying to explain to them what actually happened, CO Jones taunted him by asking him if he and Perry "went all the way" together. The other two officers then left.

29. COs Jones, along with Dobias, and Lien who had arrived, then handcuffed Mr. Buckley from behind, and placed him in a segregation shower to prepare him for transfer to solitary confinement.

## The Incident in the Segregation Shower is Videotaped

30. The video shows five COs wearing full riot gear, with gas masks and shields, marching single file towards the segregation shower, where Mr. Buckley was standing, fully clothed. He had managed to move his hands, still handcuffed, to his front.

31. COs Dobias, Lien, and Jones were among these officers. They ordered him to remove his clothing ("strip into seg"), despite being handcuffed, threatening him with misconducts if he did not do so.

32. Mr. Buckley appears distraught and disoriented in the video. He told COs Dobias, Lien, and Jones that he could not take his clothes his off because of the cuffing, and the COs again ordered him to remove his clothing, saying "you need to strip your clothes off."

33. Mr. Buckley repeatedly states "I don't understand."

34. After a few more minutes, and after being told that he had "one last chance," Mr. Buckley pleaded that he could not do this, the COs pepper-sprayed Mr. Buckley for several seconds.

35. After being pepper-sprayed Mr. Buckley crumpled to the floor in agony. He still could not take his clothes off as his hands were cuffed. The COs responded by blasting pepper-spray at Mr. Buckley for a second time and continuing to exhort him to remove his clothing.

33. Eventually, over the course of the next several minutes, as the officers continued to shout at him, Mr. Buckley finally succeeded – despite his handcuffed state, and while repeatedly coughing – in removing his clothing and passing it through to the officers.

34. Mr. Buckley was allowed to quickly rinse under the shower, then hauled away to solitary confinement.

35. The mace in Mr. Buckley's eyes burned for two days and the wound on his head from Perry's attack seared, as he remained in solitary confinement for approximately ten days.

### Buckley Receives Misconduct Reports

36. Despite being attacked and pepper-sprayed, the prison issued two misconduct reports to Mr. Buckley, dated August 30, 2023, blaming him for the incidents.

37. Report B-10, reported by CO Dobias, alleges that Mr. Buckley attacked Perry. This report was filed despite Mr. Buckley's visible injuries and Perry's history of violence towards his cellmates.

38. Report A-30, based on allegations by Dobias, Lien, Jones, and Proctor, alleges that Mr. Buckley refused to follow orders when he did not take his clothes off in the segregation shower, and that he allegedly twice stated "You're going to have to force me out of here." The video does not support that statement ever being made. .

## Mr. Buckley Files Three Grievances

39. In response to these incidents, Mr. Buckley filed three grievances in the prison system.

40. In the first (#26A, filed on September 5, 2023) he wrote that he was beaten by his bunkmate Perry and suggested that he was physically affected the assault. He named Tobias, Lien, and Jones and charged that he was refused in being allowed to have his handcuffs removed, so that he could remove his clothing. He stated that the chemical agent burned for two days without relief and his head wound seared for days.

41. Based on interviews with Dobias, Lien, and Jones, who all reported facts not supported by the video, the grievance was denied and Mr. Buckley appealed to Step II.

42. The Step II appeal was also denied, stating that Mr. Buckley was only choosing to refuse to follow orders when he did not take his clothes off. The denial says that Mr. Buckley should have been able to take his clothes off because he could have moved his handcuffs from his back to the front of his body.

43. Mr. Buckley appealed to Step III and that appeal was also denied.

44. Mr. Buckley's second grievance, titled #28C also filed on September 5, 2023. Throughout this grievance process, Mr. Buckley alleged that "I and multiple inmates told officers and staff about Perry's previous behavior" but officers refused to move him. "I asked CO Sprague to be moved. He said he found that spot for me. The next day I asked CO Finney to be moved and

7

he told me that he didn't care if we killed each other or not. I told PC Fleck too and he dismissed my complaint. … I also wrote this on the emailing system to MTU Inspector what Finney had said. In result of this deliberate indifference I was struck by my bunkie, gassed, and had been retaliated against by staff."

45.    Mr. Buckley's grievance, along with his Step II and Step III appeals, were all denied.

46.    Mr. Buckley's third grievance, titled #28I, details the officers' derogatory and inappropriate responses to Perry's attack. He explained that he first reported the attack to CO Jones who responded by asking "did you go all the way and did you like it?" Jones then pointed out that Perry had marks on his hands and asked Buckley if Perry "had his way." Mr. Buckley showed CO Jones the marks on his head. CO Jones replied that his camera was broken and again asked Mr. Buckley if "old man Perry" had his way with him.

47.    This grievance, as well as his Step II and Step III appeals were all denied.

**A Journalist Makes a FOIA Request, and the ACLU Files Suit**

48.    On or about November 1, 2024, Daniel Moritz-Rabson, a freelance journalist, made a request under the Freedom of Information Act to the Michigan Department of Corrections, seeking:

>    a.    "Copies of any video or audio recordings (including, but not limited to surveillance footage or handheld camera footage) that captured, to any extent, Cell 10 in the B Unit of the Handlon Correctional Facility from August 30, 2023, between 12 a.m. and 2 a.m. local time"; and

>    b.    "Copies of all video footage (including, but not limited to surveillance footage or handheld camera footage) capturing the shower intake area in the segregation section of the A-unit of the Handlon Correctional Facility on August 30, 2023, between 12 a.m. and 2 a.m. local time."

49.    They denied the FOIA as well as Moritz-Rabson's subsequent appeal.

8

50. On April 29, 2024, the American Civil Liberties Union filed a lawsuit under the Freedom of Information Act to compel disclosure. (*Moritz-Rabson v. Michigan Department of Corrections*, Court of Claims #  24-000058-MZ)

51. The lawsuit generally recounted the facts as set forth above, including this statement: "The incident, and its timing so soon after Buckley's article was published, is concerning as it demonstrates a potentially retaliatory punishment by MDOC corrections officers for Buckley's public criticism of MDOC practices towards incarcerated individuals in facilities like Handlon."

52. The case was dismissed in October, 2024 on stipulation of the parties, after the MDOC agreed to provide the video to the ACLU.

## LEGAL ALLEGATIONS

### COUNT I – Retaliation in Violation of the First Amendment

53. In order to state a claim for retaliation under the First Amendment, Plaintiff must prove that (1) he engaged in protected activities, (2) that action was taken against Plaintiff that would deter him from continuing to engage in the protected activity, and (3) that the adverse action was motivated by Plaintiff's engagement in the protected activity.

54. Mr. Buckley's article criticizing the MDOC officers at Handlon is a protected activity under the First Amendment.

55. These defendants had knowledge of the article, and, on information and belief, transferred Mr. Buckley to Perry's cell based on the article.

56. As a result of Mr. Buckley's article, COs at Handlon Correctional Facility transferred Mr. Buckley to Perry's cell for no penological reason. Perry had a history of violence towards his cellmates which the COs were aware of.

57. Defendants moved Mr. Buckley to Perry's cell because of the article he wrote, knowing he would be victimized by Perry's violence. This would sufficiently chill a person of ordinary firmness from engaging in their First Amendment to free speech.

58. These Defendants, in particular, who facilitated moving Mr. Buckley to Perry's cell, and declined to move him even as they were aware of potential violence, were Finney (see, e.g. paragraphs 18, 21, and 44), Sprague (see, e.g., paragraphs 15, 20, and 44), Jones (see, e.g., paragraphs 26-29), and Fleck (paragraph 44).

59. These Defendants also defended their actions with false and misleading statements during the investigation into Mr. Buckley's grievances, 28C and 28I, and in support of the misconduct investigations into Mr. Buckley, B10.

60. These Defendants' conduct displayed wanton indifference to Mr. Buckley's safety and violated clearly established law; as such, Defendants are not entitled to qualified immunity.

### COUNT II – Excessive Force in Violation of the Eighth Amendment

61. COs Jones, Dobias, and Lien, and other unknown defendants possibly , acted maliciously to inflict unnecessary and excessive punishment in violation of the Eighth Amendment when they pepper-sprayed Mr. Buckley in the segregation shower for not complying with a nearly impossible task, and then not allowing him to sufficiently rinse the mace out of his eyes before being locked in a segregation cell.

62. Defendants knew that Mr. Buckley could not take his clothes off as he was ordered to do so, as his hands were cuffed behind. Instead, Defendants pepper-sprayed Mr. Buckley as a means of further punishing him for his article criticizing MDOC and their officers.

63. At no point did Buckley pose a threat of any danger to the officers. He was seized, handcuffed, and thrown into detention on his own report of Perry being violent towards him.

64. He was not given any medical attention for his injury from Perry, nor from the pepper spray causing him distress, breathing difficulties, and burning pain and eyes.

65. On information and belief, Jones, Dobias, Proctor, and Lien also defended their actions with false and misleading statements during the process of the investigation into Mr. Buckley's grievance 26A, and in support of the misconduct investigations into Mr. Buckley, A30.

66. The extent of the injuries are objectively serious, thereby implicating the Eighth Amendment.

## JURY DEMAND

Plaintiff demands a jury trial.

## RELIEF REQUESTED

*W H E R E F O R E*, Plaintiff requests this Honorable Court enter Judgment against Defendants in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, together with interest, costs, and attorney fees, along with declaratory relief and other appropriate measures this Court deems just and equitable.

Respectfully submitted,
**ROUMEL LAW**

*/s/ Nicholas Roumel*

April 26, 2025

Attorneys for Plaintiff